SIRI & GLIMSTAD LLP
Elizabeth A. Brehm (admitted *pro hac vice*)
ebrehm@sirillp.com
Mason Barney (admitted *pro hac vice*)
mbarney@sirillp.com
Sonal Jain (admitted *pro hac vice*)
sjain@sirillp.com
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: 212-532-1091
Facsimile: 646-417-5967

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| IN RE ROBINHOOD DATA SECURITY LITIGATION | Case No. 3:21-cv-08906-JD |
|---|---|
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

i

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

Plaintiffs CHRISTINA LOPEZ, RACHEL BARNETT, KAREN BENOIT, MARK GLINOGA, ADAM ZULLO, THOMAS BARRETTI, DONNA ARDIZZONE, LEONARD ROSE, and PEDRO OCAMPO (each a "Plaintiff" and collectively "Plaintiffs") individually and on behalf of similarly situated persons defined below, allege the following against Defendants ROBINHOOD MARKETS, INC., ROBINHOOD CRYPTO, LLC, ROBINHOOD FINANCIAL LLC, and ROBINHOOD SECURITIES, LLC (collectively, "Robinhood" or "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## I.   **INTRODUCTION**

1.     Plaintiffs bring this class action against Robinhood for its failure to properly secure and safeguard Plaintiffs' and other similarly situated Robinhood customers' personal information from hackers.

2.     Robinhood is a financial services company that allows customers to trade securities on its website and through its mobile application.

3.     On November 3, 2021, hackers gained access to the personally identifiable information ("PII") of over 7 million Robinhood customers (the "Data Breach"), including full names, email addresses, dates of birth, zip codes, and other PII.

4.     Thereafter, on November 8, 2021, Robinhood announced the Data Breach. At least since that date, Robinhood has maintained a blog post on its website titled, "Robinhood Announces Data Security Incident."[1] The blog post states, in part, "Late in the evening of November 3, we experienced a data security incident. An

---

[1] https://blog.robinhood.com/news/2021/11/8/data-security-incident (last accessed Mar. 16, 2023.) The blog post was updated with clarifying material on November 16, 2021.  *See id.*

1

unauthorized third party obtained access to a limited amount of personal information for a portion of our customers."[2]

5.   Robinhood customers' PII was posted for sale on the dark web.[3] Hackers offered for sale the unencrypted, unredacted, stolen PII to criminals.[4] In that offer, the hackers stated that Robinhood had not made a full disclosure of all the information that was stolen and indeed, the hackers announced that what they actually stole "is highly profitable if in the right hands."[5] Because of Robinhood's Data Breach, customers' PII is still available on the dark web for criminals to access and abuse. As a result, Robinhood's customers, including Plaintiffs, have been victims of identity theft, fraud, unlawful account access, unauthorized financial transactions, fraudulent government filings, have been locked out of their accounts, have had difficulty and/or inability to regain account access, and face a lifetime risk of such activities.

6.   Clearly, Robinhood failed to safeguard Plaintiffs' and other customers' PII, and this was not the first time Robinhood had failed to safeguard PII. In fact, in October 2020, approximately 2,000 Robinhood users' accounts had been hacked or compromised just thirteen (13) months prior to the subject Data Breach, with many of those accounts having enabled two-factor authentication. The fact that accounts with two-factor authentication enabled were compromised in October 2020 and then again in November 2021 is indicative of Robinhood's failures and gross negligence to implement and maintain data security measures that are consistent with the law, best practices, and industry standards.

7.   Plaintiffs and similarly situated Robinhood customers (the "Class Members" or the "Class") have suffered the aforesaid injuries because of

---

[2] *Id.*
[3] *See* https://www.privacyaffairs.com/robinhood-data-breach/ (last accessed Mar. 16, 2023).
[4] *Id.*
[5] *Id.*

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

Robinhood's conduct. Additional injuries suffered by Plaintiffs and Class Members as a direct result of the Data Breach include, *inter alia*:

    a. Theft of their PII;

    b. Costs associated with the detection and prevention of identity theft;

    c. Costs associated with time spent and the loss of productivity from taking time to address and attempting to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

    d. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals, which has already been misused via the sale of Plaintiffs' and the Class Members' information on the Internet black market;

    e. Damages to and diminution in value of their PII entrusted to Robinhood with the mutual understanding that Robinhood would safeguard Plaintiffs' and the Class Members' data against theft and not allow access to and misuse of their PII by others;

    f. Continued risk to their PII, which remains in the possession of Robinhood, and which is subject to further breaches so long as Robinhood continues to fail to undertake appropriate and adequate measures to protect Plaintiffs' and the Class Members' data in its possession.

8.    Plaintiffs bring this action on behalf of all persons whose PII was compromised due to Robinhood's failure to: (i) adequately protect its users' PII; (ii) warn users of its inadequate information security practices; and (iii) effectively

3

monitor its websites and e-commerce platforms for security vulnerabilities and incidents. Robinhood's conduct amounts to negligence and violates federal and California laws as invoked below.

## II.   JURISDICTION AND VENUE/DIVISIONAL ASSIGNMENT

9.   This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. At least one member of the class is a citizen of a state different from Robinhood.

10.   California state law applies here in accordance with Robinhood's Terms and Conditions.[6]

11.   This Court has personal jurisdiction over Robinhood because it regularly conducts business in California, has sufficient minimum contacts in California, including its principal place of business, and intentionally avails itself of this jurisdiction by marketing and selling products and services in California.

12.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District, including (upon information and belief) the Data Breach. Robinhood caused harm to Plaintiffs and the Class Members through its actions in this District. Additionally, Robinhood's principal place of business is located within the District.

## III.   PARTIES

13.   Plaintiff Christina Lopez is a citizen of Illinois residing in Chicago. Plaintiff Lopez is a Robinhood customer. On November 8, 2021, she received an email from Robinhood informing her of the Data Breach and that her PII had been stolen.

---

[6]https://cdn.robinhood.com/assets/robinhood/legal/Robinhood%20Terms%20and%20Conditions.pdf (last accessed Mar. 16, 2023) ("You agree that these Terms and Conditions shall be governed by and interpreted in accordance with the laws of the State of California . . . .").

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

14.     Plaintiff Rachel Barnett is a citizen of Illinois residing in Benton. Plaintiff Barnett is a Robinhood customer. On November 8, 2021, she received an email from Robinhood informing her of the Data Breach and that her PII had been stolen.

15.     Plaintiff Karen Benoit is a citizen of Massachusetts residing in Seekonk. Plaintiff Benoit is a Robinhood customer. On November 8, 2021, she received an email from Robinhood informing her of the Data Breach and that her PII had been stolen.

16.     Plaintiff Mark Glinoga is a citizen of California who resides in Los Angeles, California. Plaintiff Glinoga has been a Robinhood customer for approximately four (4) years. On November 8, 2021, Glinoga received an email and app notification from Defendants informing Glinoga that his PII had been stolen.

17.     Plaintiff Adam Zullo is a Robinhood customer residing in Nassau County, New York. On November 8, 2021, he received an email from Robinhood informing him of the Data Breach and that his PII had been stolen.

18.     Plaintiff Thomas Barretti is a Robinhood customer residing in Woodbury, New York. On November 8, 2021, he received an email from Robinhood informing him of the Data Breach and that his PII had been stolen.

19.     Plaintiff Donna Ardizzone is a Robinhood customer residing in Westbury, New York. On November 8, 2021, she received an email from Robinhood informing her of the Data Breach and that her PII had been stolen.

20.     Plaintiff Leonard Rose is a Robinhood customer residing in Jamaica, New York. On November 8, 2021, he received an email from Robinhood informing him of the Data Breach and that his PII had been stolen.

21.     Plaintiff Pedro Ocampo is a Robinhood customer residing in Alhambra, California. On November 8, 2021, he received an email from Robinhood informing him of the Data Breach and that his PII had been stolen.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

22.     Defendant Robinhood Markets, Inc. is a publicly-traded corporation organized under the laws of the State of Delaware, with a principal place of business at 85 Willow Road, Menlo Park, CA, 94025. Defendant Robinhood Markets, Inc. advertises its services and sells products to customers nationwide through its website as well as through its mobile application. Its website can be found at the robinhood.com URL, which is registered to Robinhood Markets, Inc. with a California address.[7]

23.     Defendant Robinhood Crypto, LLC is a limited liability company organized under the laws of the State of Delaware, with a principal place of business at 85 Willow Road, Menlo Park, CA, 94025. Defendant Robinhood Crypto, LLC is a wholly-owned subsidiary of Defendant Robinhood Markets, Inc.

24.     Defendant Robinhood Securities, LLC is a limited liability company organized under the laws of the State of Delaware, with a principal place of business at 85 Willow Road, Menlo Park, CA, 94025. Defendant Robinhood Securities, LLC is a wholly-owned subsidiary of Defendant Robinhood Markets, Inc.

25.     Defendant Robinhood Financial LLC is a limited liability company organized under the laws of the State of Delaware, with a principal place of business at 85 Willow Road, Menlo Park, CA, 94025. Defendant Robinhood Financial LLC is a wholly-owned subsidiary of Defendant Robinhood Markets, Inc.

## IV.   <u>FACTUAL ALLEGATIONS</u>

### A. <u>Background</u>

26.     Robinhood is a financial services company that allows its more than 31 million customers to trade stocks, exchange-traded funds, and cryptocurrencies through its website and mobile application.

27.     Robinhood maintains office locations across the United States as well as in the United Kingdom.

---

[7] *See* https://www.whois.com/whois/robinhood.com (last visited on Mar. 16, 2023).

28.     Robinhood's website allows customer to log in using their email address and a password.  It offers two-factor authentication in some instances, but does not require two-factor authentication for every login attempt.

**B.** **Robinhood's Personal Information Collection Practices**

29.     Robinhood's website provides consumers with a privacy policy that informs them of what PII will be collected and how that PII will be used (the "Privacy Policy").

30.     The October 18, 2021 version of the privacy policy (i.e. the version in place at the time of the Data Breach) starts by saying "At Robinhood, we take privacy and security seriously."[8]  The Policy then describes how, in the ordinary course of doing business with its customers, among other things, Robinhood collects a customer's name, date of birth, marital status, social security number, biometric identifiers, data from government-issued identification documents, email address, mailing address, telephone number, bank account and payment card details, information about income, account balances, financial transaction history, credit history, tax information, credit scores, username and password, knowledge assessment results, interests, preferences, feedback, survey responses, photos from mobile phone gallery or contacts stored in customer's mobile device or email accounts, usage information regarding the customer's use of the company's services, transactional information, GPS location of a customer's mobile device, and additional data provided to customers via focus groups, contests/sweepstakes, customer support, and other means.

31.     Robinhood's Privacy Policy makes clear that the company not only collects this information through its services, but it also collects information about

---

[8] https://web.archive.org/web/20211128204354/
https://robinhood.com/us/en/support/articles/privacy-policy/ (the Wayback Machine Internet Archive) (archive taken as of October 22, 2021).

its customers "from companies that we do business with, such as name, contact data, inferences about your preferences and attributes, as well as inferred fraud risk, from identity verification and fraud prevention partners." It further claims to collect customers "interactions with our social media platforms, and other information from publicly available sources, such as public websites."

32.     Relating to California customers, the Robinhood Privacy Policy states the following: "In the last 12 months, we collected the following categories of personal information subject to the [California Consumer Privacy Act]: identifiers (such as email address and IP address), approximate geolocation information, Internet or other electronic network activity information (such as browsing history and related usage data), and inferences from your interactions with our platform."

33.     In its Privacy Policy, Robinhood promises not to disclose customers' information except for the following instances: (1) to authorized third-party vendors and service providers, (2) to companies in which customers' hold securities; (3) to Robinhood affiliates; (4) during substantial corporate transactions; (5) for legal purposes; or (6) with customers' consent.[9]

34.     Robinhood's website also promises customers that it employs "a number of industry-standard measures to protect your account and ensure your experience with us is safe and secure."[10]

## C. **The Data Breach**

35.     Despite Robinhood's representation that it had implemented a number of industry-standard measures, Robinhood failed to prioritize data and cyber security by adopting reasonable data and cybersecurity measures to prevent and detect the

---

[9] *See* https://robinhood.com/us/en/support/articles/privacy-policy/ ("Robinhood Privacy Policy") (last visited Mar. 16, 2023).

[10] *See* https://robinhood.com/us/en/support/articles/how-youre-protected/ ("How you're protected.") (last visited Mar. 16, 2023).

unauthorized access to Plaintiffs' and the Class Members' PII. Indeed, as noted above, this is at least the second data breach Robinhood has suffered due to its lackluster data security measures.

36.    On November 8, 2021, Robinhood announced the Data Breach on its website. In a blog post titled "Robinhood Announces Data Security Incident," Robinhood stated the following:

> Late in the evening of November 3, we experienced a data security incident. An unauthorized third party obtained access to a limited amount of personal information for a portion of our customers. Based on our investigation, the attack has been contained and we believe that no Social Security numbers, bank account numbers, or debit card numbers were exposed and that there has been no financial loss to any customers as a result of the incident.
>
> The unauthorized party socially engineered a customer support employee by phone and obtained access to certain customer support systems. At this time, we understand that the unauthorized party obtained a list of email addresses for approximately five million people, and full names for a different group of approximately two million people. We also believe that for a more limited number of people—approximately 310 in total—additional personal information, including name, date of birth, and zip code, was exposed, with a subset of approximately 10 customers having more extensive account details revealed.[11]

37.    On November 16, 2021, Robinhood updated its November 8, 2021 announcement to admit that further information, including customers' phone numbers and other undisclosed types of PII, held in "other text entries" were exposed in the Data Breach.[12]

---

[11] https://blog.robinhood.com/news/2021/11/8/data-security-incident (last accessed Mar. 16, 2023.)

[12] *Id.*

38.     It thus appears that Robinhood did not implement adequate security measures despite Robinhood's promises that it: (i) would not disclose consumers' PII; and (ii) would protect consumers' PII with adequate security measures. Reasonable security measures would not have allowed a bad actor to socially engineer a customer support employee and obtain access to customer data for *seven million* customers.   Among other things, Robinhood's data security should have involved greater training on the threat of social engineering attacks, improved processes to prevent social engineering attacks, and limits on access for low level customer support personnel so that a single hacked password could not result in such a large breach of security.

39.     Robinhood customers' PII exposed in the Data Breach has been put up for sale on the dark web.[13]

40.     As reported by bleepingcomputer.com, user "pompompurin" posted in a hacker forum that they were selling the stolen Robinhood user data.[14] The post, pictured below, contains photographic proof of access to the Robinhood user data.



---

[13] *See FBI Hacker Offers to Sell Data Allegedly Stolen in Robinhood Breach*, SECURITY WEEK (Nov. 16, 2021), https://www.securityweek.com/fbi-hacker-offers-sell-data-allegedly-stolen-robinhood-breach (last visited Mar. 16, 2023).

[14] https://www.bleepingcomputer.com/news/security/7-million-robinhood-user-email-addresses-for-sale-on-hacker-forum/ (Nov. 15, 2021) (last visited Mar. 16, 2023).

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

41.   As disclosed by Robinhood and the purported "seller of the information," the PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft and/or to sell it to criminals who have purchased or will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach has either already occurred or in some cases may not come to light for years.

42.   As shown in the bleepingcomputer.com image, the seller stated that the breach was more expansive than Robinhood had admitted at the time of the post. The hacker stated that "as you should already assume robinhood [sic] did lie," when it reported in its announcement about what was taken.  He claimed what the company publicly disclosed "was not all that was taken, IDs were also downloaded from sendsafely." SendSafely is a file transfer system used by Robinhood during a customers' "Know Your Customer" verification process, which, in theory, allows the customer to securely transfer sensitive information, like driver's license images to the company.[15] The fact that, with a single password, the hacker was able to gain access to a supposedly secure and sensitive system like SendSafely is yet another example of how Robinhood's internal security processes did not rise to the standard set by the industry.

43.   The seller indicated that he was expecting to sell the information for at least "five figures," insisting that he would accept "no lowball offers" because the information is "highly profitable in the right hands." Given the incidents that have happened to Plaintiffs described below, it appears almost certain that one or more bad actors have taken the seller up on his or her offer. As a result, Class Members face a lifetime risk of identity theft.

---

[15] https://www.privacyaffairs.com/robinhood-data-breach/

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

## D. <u>Defendants Were Aware of the Risks of a Data Breach</u>

44.    Defendants had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Members of the Class to keep their PII confidential and to protect it from unauthorized access and disclosure.

45.    Plaintiffs and Class Members provided their PII to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

46.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches preceding the date of the breach, the scope of which was widely known and completely foreseeable to the public and to anyone in Defendants' industry, including Defendants. This is especially true given that Defendants had already been hacked in 2020, so they were particularly on notice of this issue.

47.    It is no secret that data breaches have become widespread. For example, the United States saw 1,291 data breaches in 2021 with exposed records numbering in the billions.[16]

48.    In addition to numerous other failures in its security measures, Robinhood lacked many of the sophisticated security features employed by other brokerage firms, including requiring changes in bank information to be verified and a telephone-based customer service/fraud reporting system. This allowed hackers to access the user accounts held by Plaintiffs and Class Members an.

49.    Defendants clearly understood this reality because of this statement, posted on Defendants' website prior to the Data Breach:

---

[16] The Top Ten Data Breaches of 2021, https://www.securitymagazine.com/articles/96667-the-top-data-breaches-of-2021 (last visited Mar. 16, 2023).

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

The reliability of our platform takes precedence over all else, so that we can be there for our customers when they need us the most. We relentlessly protect our customers' security and privacy, and we only share with our counterparties what they need to fulfill our customers' financial needs, nothing more. We build safeguards and provide education so that our customers are in the best position to succeed. We have high quality timely customer support, and when things aren't right, we fix them. We work closely with regulators and lawmakers to protect our customers and the broader financial system. We speak simply, plainly, and truthfully, even if it's not what others want to hear. We hold ourselves and our colleagues to the highest ethical standards.[17]

50.     However, Robinhood failed to fully implement data security systems and protect critical PII belonging to users.

51.     Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including specifically, the significant costs that would be imposed on Plaintiffs and Class Members because of the breach.

52.     Indeed, Defendants show knowledge of the importance of safeguarding user PII based in its Privacy Policy. In its Privacy Policy, Robinhood promises not to disclose customers' information except to third-party vendors, companies which users hold securities, Robinhood affiliates, for legal purposes, or with customers' consent.

53.     Despite this Privacy Policy, Robinhood failed to safeguard customer PII during the Data Breach, leaving Plaintiffs and Class Members vulnerable to financial losses, fraud, identity theft, and further cyber-attack in the future.

54.     Plaintiffs and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights. Class Members are incurring

---

[17] https://robinhood.com/us/en/about-us/. Last Accessed Dec. 1, 2021.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

and will continue to incur such damages in addition to any fraudulent use of their PII.

55.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

**E.   Defendants Failed to Comply with FTC and NIST Guidelines on Protecting Customer Personal Information**

56.     The Federal Trade Commission ("FTC") has held that the failure to employ reasonable measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act ("FTCA") (codified by 15 U.S.C. § 45).

57.     Under the FTCA, Robinhood is prohibited from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA.

58.     Beginning in 2007, the FTC released a set of industry standards related to data security and the data security practices of businesses, called "Protecting Personal Information: A Guide for Businesses" (the "FTC Guide").[18] In 2011, this guidance was updated to include fundamental data security principles for businesses. In addition to the necessity to protect consumer data, the guide established that:

- Businesses should dispose of PII that is no longer needed;

---

[18] *See FTC Unveils Practice Suggestions for Businesses on Safeguarding Personal Information*, FEDERAL TRADE COMM'N (Mar. 8, 2007), https://www.ftc.gov/news-events/press-releases/2007/03/ftc-unveils-practical-suggestions-businesses-safeguarding (last visited on Mar. 16, 2023); *see also* Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business, Federal Trade Commission* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal information.pdf (updated FTC Guide) (last visited on Mar. 16, 2023).

14

- Businesses should encrypt PII on computer networks so that it is unreadable even if hackers are able to gain access to the information;
- Businesses should thoroughly understand the types of vulnerabilities on their network and how to address said vulnerabilities;
- Businesses should implement protocols necessary to correct security breaches;
- Businesses should install intrusion detection systems to expose security breaches at the moment they occur;
- Businesses should install monitoring mechanisms to watch for massive troves of data being transmitted from their systems; and
- Businesses should have an emergency plan prepared in response to a breach.

59.     On information and belief, Robinhood failed to adequately address the foregoing requirements in the FTC Guide. It appears that Robinhood did not adequately encrypt PII, did not install proper monitoring mechanisms, and did not properly understand the vulnerabilities of its network. If it had properly done these things, a bad actor would not have been able to socially engineer a customer support employee and obtain access to customer data for seven million Robinhood customers.

60.     In 2015, the FTC supplemented the FTC Guide with a publication called "Start with Security" (the "Supplemented FTC Guide").[19] This supplement added further requirements for businesses that maintain customer data on their networks:

---

[19] Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Mar. 16, 2023).

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

- Businesses should not keep PII stored on their networks for any period longer than what is needed for authorization;
- Businesses should use industry-tested methods for data security; and,
- Businesses should be continuously monitoring for suspicious activity on their network.

61.     Again, Robinhood apparently failed to adequately address these requirements enumerated in the Supplemented FTC Guide. If it had used industry-tested methods for data security, a bad actor would not have been able to socially engineer a customer support employee and obtain access to customer data for seven million Robinhood customers.

62.     Furthermore, the FTC has issued orders against businesses for failing to employ reasonable measures to safeguard customer data. The orders provide further public guidance to businesses concerning their data security obligations.

63.     Robinhood knew or should have known about its obligation to comply with the FTCA, the FTC Guide, the Supplemented FTC Guide, and many other FTC pronouncements regarding data security.

64.     Thus, among other things, Robinhood's misconduct violated the FTCA and the FTC's data security pronouncements, led to the Data Breach, and resulted in harm directly and proximately to Plaintiffs and the Class Members.

**F.     Defendants Failed to Take Sufficient Precautions Against the type of Social Engineering Hacking that Occurred Here**

65.     In addition to the foregoing advice provided by the FTC and industry commentators, those same organizations have long warned against the type of social engineering hacking that occurred in this data breach, and have promoted ways to protect against such attacks. The fact that Robinhood admits that the instant Data Breach occurred because an "unauthorized party socially engineered a customer support employee by phone and obtained access to certain customer support

16

systems"[20] means that the company did not adequately implement the protections against social engineering advocated for by the FTC and industry leaders.

66.     In fact, as early as May 2018 the FTC warned against exactly the type of social engineering hack that occurred here.  The agency published a report as part of its "Business Guidance Resources" entitled "Scams and Your Small Business: A Guide for Business."[21]   In a section entitled "Social Engineering, Phishing, and Ransomware" the Agency warned:

> Cyber scammers can trick employees into giving up confidential or sensitive information, such as passwords or bank information. It often starts with a phishing email, social media contact, or **a call that seems to come from a trusted source, such as a supervisor or other senior employee, but creates urgency or fear**. Scammers tell employees to wire money or **provide access to sensitive company information**. Other emails may look like routine password update requests or other automated messages but are actually attempts to steal your information.[22]

67.     Among other things, the Agency recommends that businesses should "Provide **regular security and privacy training** to … device engineers, and send frequent security and privacy reminders to help prevent them from falling victim to social engineering tactics, such as targeted phishing attempts."[23]

68.     Similarly, cyber security industry leaders and commentators have warned against the threat posed by social engineering for more than a decade.[24]  For instance, in January 2021 cybersecurity industry leader Kaspersky Lab provided

---

[20] https://blog.robinhood.com/news/2021/11/8/data-security-incident
[21] https://www.ftc.gov/business-guidance/resources/scams-your-small-business-guide-business
[22] *Id.* (emphasis added)
[23] https://www.ftc.gov/business-guidance/resources/careful-connections-keeping-internet-things-secure
[24] Olavsrud, Thor, *9 Best Defenses Against Social Engineering Attacks* (eSecurity Plane, Oct. 19, 2010) https://www.esecurityplanet.com/trends/best-defenses-against-social-engineering-attacks/ (providing the results of social engineering tests and proposing solutions).

17

simple recommendations to prevent social engineering attacks.[25]  It recommended that companies train their employees to do things like "check the source" of contacts, and confirm that the source is authentic by asking for information you would expect the source to have (*e.g.*, if it is a call from the IT department do they know your desk location, or computer number).  It also suggests ensuring devices are protected through recommendations like: (1) "Keep software and firmware regularly updated;" (2) advising employees to not "use the same password for different accounts;" and (3) "For critical [internal company] accounts, use two-factor authentication."[26]

69.    Kaspersky Lab is far from the only industry leader that provides these types of recommendations.  In November 2020, a year before the Data Breach, Security Magazine published an article entitled "Avoid social engineering attacks and protect employees" which recommended automated traffic analysis programs that can automatically monitor for malicious programs, and regular training and education for employees to identify when they are being socially engineered, noting that: "[i]f your company doesn't offer it, there are several free online courses."[27]

70.    Similarly, IBM also recommends regular cybersecurity training to help employees recognize social engineering attempts, and software or hardware that "can help security teams quickly detect and neutralize security threats that infect the network via social engineering tactics."[28]  The company then goes on to recommend:

> **Access control policies**: Secure access control policies and technologies, including multi-factor authentication, adaptive authentication and a zero trust security approach can limit cybercriminals' access to sensitive information and

---

[25] https://usa.kaspersky.com/resource-center/threats/how-to-avoid-social-engineering-attacks
[26] *Id.*
[27] Jackson, Adam, *Avoid social engineering attacks and protect employees* (Security Magazine, Nov. 11, 2020) *available at* https://www.securitymagazine.com/articles/93536-avoid-social-engineering-attacks-and-protect-employees
[28] https://www.ibm.com/topics/social-engineering

18

assets on the corporate network even, if they obtain users' login credentials.[29]

71.    On information and belief, Defendants did not implement these recommendations at all, or if they were implemented did so negligently, because if they had adequately implemented such recommendations then the Data Breach would not have occurred.  Implementing appropriate access controls, such as proper access control policies and two factor authentication, is just one thing that on information and belief Defendants failed to do that could have prevented the hacker from using a single customer support employee's access information to access vast amounts of data, or to access supposedly secure systems like SendSafely.

**G. Value of Personally Identifiable Information**

72.    All Plaintiffs and Class members also suffered a loss of value of their PII.

73.    PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

74.    The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[30] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry, including Defendants, who had already experienced a recent breach.

---

[29] *Id.*

[30] See *Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military (last visited March 17, 2022).

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

75.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[31] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[32]

76.     Furthermore, even information such as names, email addresses and phone numbers, can have value to a hacker, as the hacker at issue here made clear in his demand for a five-figure payout in his post on the dark web.  Beyond things like spamming customers, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual.  It is often this type of piecing together of a puzzle that allows hackers to successfully do phishing attacks or social engineering attacks.  This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[33]

77.     Stolen email addresses or phone numbers linked to financial accounts, such as those exposed by Robinhood, are particularly problematic, as they can be used by cybercriminals in targeted phishing attacks that focus on those financial accounts, as some Plaintiffs and Class Members have already experienced. On the Robinhood platform, email addresses take on an particular importance because they

---

[31] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Mar. 16, 2023).

[32] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Mar. 16, 2023).

[33] https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

are part of the log-in credentials users input to access their accounts. Thus, with the list of millions of email addresses stolen from Robinhood, a bad actor would know half of the information required to access an account.  Knowing a person's email address, there are many ways for a bad actor to acquire that person's Robinhood password, for example through a social engineering attack, or even through just a brute force attack (where the hacker repeatedly attempts to input different passwords in hopes of guessing the right one).  With both the email address and password, the bad actor could then theoretically access  a user's Robinhood account, especially if the user does not have Robinhood's optional two-factor authentication enabled for every login attempt.  Thus, email addresses that a bad actor knows came from Robinhood have increased value due to their use in secondary hacking attempts, and present an increased risk for Robinhood users.

78.    The Dark Web Price Index of 2022, published by PrivacyAffairs[34] shows just how valuable email addresses alone can be, even when not associated with a financial account:

| Email Database Dumps | Avg. Price USD (2022) |
| --- | --- |
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

79.    Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails, as has occurred to several Plaintiffs.  If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

---

[34] https://www.privacyaffairs.com/dark-web-price-index-2022/

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

80.     Likewise, the value of personal information is increasingly evident in our digital economy.  Many companies including Robinhood collect personal information for purposes of data analytics and marketing. Robinhood recognizes the value of personal information, collect it to better target customers to increase its profits, and shares it with third parties for similar purposes.[35]

81.     One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[36]

82.     Consumers also recognize the value of their personal information, and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather in the economic benefit consumers derive from being able to use it and control the use of it.

83.     A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user.  In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

84.     Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiffs' PII impairs their ability to participate in the economic marketplace.

---

[35] https://robinhood.com/us/en/support/articles/privacy-policy/

[36] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

85.     A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of PII.[37]



86.     Given the importance of safeguarding PII and of the foreseeable consequences that would occur if its data security system was breached, including specifically the significant costs that would be imposed on its customers as a result of a breach, Robinhood was, or should have been, fully aware of its responsibilities towards protecting customer PII, and knew or should have known that its failure to do so would diminish the value of its customers' PII.

**H. <u>Damage to Plaintiffs and the Class Members Caused by the Data Breach</u>**

87.     The experiences of Plaintiffs and the Class Members show how consumers can be specifically damaged because their PII was accessed by a hacker.

---

[37] Source: "*Credit Card and ID Theft Statistics*" by Jason Steele, Oct. 24, 2017, https://www. creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited Mar. 16, 2023).

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

In fact, Plaintiffs have suffered serious injuries directly tied to the exposure of data in this Data Breach, as summarized below.

88.     As a direct and proximate result of Robinhood's conduct, Plaintiffs and the Class have been victims of identity theft, fraud, unlawful account access, unauthorized financial transactions, fraudulent government filings, locked out of their accounts, difficulty and/or inability to regain account access, and placed at an imminent, immediate, and continuing increased risk of future harm from fraud. Plaintiffs now have to take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives.

89.     Plaintiff Glinoga received notice from credit monitoring software that his email address was compromised, traced back to the breach from Robinhood's website. Plaintiff Glinoga continues to receive substantially increased numbers of spam emails since the Breach occurred.

90.     Plaintiff Lopez's bank account was hacked and she lost $1,000, which her bank has not refunded and which represented the entirety of her savings. She spent a month trying to resolve the issue with her bank, with one of her phone calls with the bank lasting for seven hours. Her account with Apple had to be closed due to the bank account hack. She has also experienced a noticeable uptick in junk mail since the Data Breach occurred. She further spent days changing all of her passwords.

91.     Plaintiff Zullo had to file a police report regarding someone using his information for cell phone charges. He has also received numerous threatening text messages since the Data Breach by individuals claiming to know his name and address and asking for money, all information that could have been obtained from the Data Breach. That has caused him to fear for his safety. He believes he has lost customers for his business because he feels it necessary to block calls when he does not know the caller's identity. He has had to change his passwords multiple times.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

92.     Plaintiff Barretti's debit card was compromised and his email account was hacked. He also believes that bad actors have obtained his phone number given that since the Data Breach he receives many texts phishing for his information as well as spam via text and email. He has had to change his passwords on the platforms he uses multiple times.

93.     Plaintiff Ardizzone filed a police report following the Breach, as someone filed for unemployment insurance using her name, address, and social security number.

94.     Plaintiff Barnett found two fraudulent charges on her debit card following the Data Breach, totaling approximately $250.00.

95.     Plaintiff Benoit had her bank information used to lease a car in Arizona following the Data Breach. During the course of her bank's investigations, some of her accounts were frozen, occurring right before Christmas and the December holiday season. Since the Data Breach, she has experienced a notable increase in spam emails, calls, and Facebook messages, junk mail sent to her house, and random text messages. She has had to spend many hours changing bank account numbers, cancelling credit cards, changing usernames and passwords, and changing her online wallets on various websites that she uses.

96.     Following the Data Breach, Plaintiff Rose's Robinhood account was accessed without authorization, and someone withdrew approximately $4,000 from his cash account also without authorization.

97.     Plaintiff Ocampo was locked out of his Robinhood account because a bad actor tried to log in as him after the Data Breach. Additionally, the same or different bad actor attempted to open a credit card in Plaintiff Ocampo's name. The same or different bad actor also attempted to log in to his social media accounts. Plaintiff Ocampo spent 5 to 6 hours dealing with these issues.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

98.    Plaintiffs and the Class Members may also incur out-of-pocket costs for protective measures such as credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

99.    As discussed above, Plaintiffs and the Class Members also suffered a loss of value of their PII when it was acquired by cyberthieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

100.    Plaintiffs and the Class Members were also damaged via benefit-of-the-bargain damages. The Privacy Policy and implied contractual bargain entered into between Plaintiffs and Robinhood included Robinhood's contractual obligation to provide adequate data security, which Robinhood failed to provide. Thus, Plaintiffs and the Class Members did not get what they paid for.

101.    Plaintiffs and the Class Members have suffered, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.   Trespass, damage to and theft of their PII;

b.   Improper disclosure of their PII property;

c.   Fraud and identity theft by customers' PII being placed in the hands of criminals and misused via the sale of such information on the internet black market;

d.   Loss of privacy suffered as a result of the Data Breach;

e.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach; and

f.   Ascertainable losses in the form of deprivation of the value of customers' PII for which there is a well-established and quantifiable national and international market.

26

1

## V.   CLASS ALLEGATIONS

2

102.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of

3

Civil Procedure on behalf of themselves and on behalf of all other persons similarly

4

situated.

5

103.   Plaintiffs propose the following Class and Subclass definitions, subject

6

to amendment as appropriate:

7

8

**Nationwide Class**:

9

All current and former Robinhood users residing in the United States

10

whose Private Information was compromised in the Data Breach
announced by the Defendants on or about November 8, 2021 (the

11

"**Nationwide Class**").

12

**California Subclass**:

13

All current and former Robinhood users residing in California whose

14

Private Information was compromised in the Data Breach announced
by the Defendants on or about November 8, 2021 (the "**California**

15

**Subclass**").

16

104.   The Nationwide Class and the California Subclass are collectively

17

referred to as the "Classes."

18

105.   Excluded from each of the above Classes are Defendants and their

19

parents or subsidiaries, any entities in which it has a controlling interest, as well as

20

its   officers,   directors,   affiliates,   legal   representatives,   heirs,   predecessors,

21

successors, and assigns. Also excluded are any Judge to whom this case is assigned

22

as well as his or her judicial staff and immediate family members.

23

106.   Plaintiffs reserve the right to modify or amend the definitions of the

24

proposed Classes before the Court determines whether certification is appropriate.

25

107.   Each of the proposed Classes meet the criteria for certification under

26

Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

27

28

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

108.   <u>Numerosity</u>. The Members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Classes each consist of at least hundreds of thousands of Robinhood customers whose PII was compromised in the Data Breach.

109.   <u>Commonality</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether Robinhood engaged in the conduct alleged herein;

b.   Whether Robinhood's conduct violated the California laws invoked below;

c.   When Robinhood actually learned of the Data Breach and whether its response was adequate;

d.   Whether Robinhood had a legal duty to adequately protect Plaintiffs' and the Class Members' PII;

e.   Whether Robinhood breached its legal duty by failing to adequately protect Plaintiffs' and the Class Members' PII;

f.   Whether Robinhood implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and the Class Members' PII;

g.   Whether Robinhood knew or should have known that it did not employ reasonable measures to keep Plaintiffs' and the Class Members' PII secure and prevent loss or misuse of that PII;

h.   Whether Robinhood has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i.   Whether Plaintiffs and the Class Members are entitled to recover actual and/or statutory damages;

28

j.  Whether Plaintiffs and the other Class Members are entitled to credit or identity monitoring and are entitled to other monetary relief; and

k.  Whether Plaintiffs and the Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

110.  <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach. Each of the Plaintiffs has been damaged in some way.

111.  <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Classes. Plaintiffs' Counsel are competent and experienced in litigating class actions, including data breach class actions.

112.  <u>Predominance</u>. Robinhood has engaged in a common course of conduct toward Plaintiffs and the Class Members, in that all Plaintiffs' and the Class Members' PII was stored on the same computer systems and unlawfully accessed during a hacking attempt. The common issues arising from Robinhood's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

113.  <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact will be superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class

29

Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Robinhood. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

114. Class certification also is appropriate under Fed. R. Civ. P. 23(b)(2). Robinhood has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

115. Finally, all Class Members are readily ascertainable because Robinhood has access to their PII and has issued notices to them concerning the Data Breach.

## COUNT I

## NEGLIGENCE

### (On behalf of Plaintiffs and the Nationwide Class)

116. Plaintiffs restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

117. Robinhood solicited and gathered PII of Plaintiffs and the Nationwide Class.

118. Robinhood knew, or should have known, of the risks inherent in collecting the PII of Plaintiffs and the Class Members and the importance of adequate security. On information and belief, Robinhood received warnings that hackers routinely attempt to access and acquire PII without authorization. Robinhood also knew or should have known about numerous, well-publicized data breaches in which it was directly affected as well, as those involving other financial services companies.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

119.   Robinhood owed a duty of care to Plaintiffs and the Class Members whose PII was entrusted to it. Robinhood's duties included the following:

    a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting PII in its possession;

    b.   To protect customers' PII using reasonable and adequate security procedures and systems that are compliant with the industry standards; and

    c.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

120.   By collecting PII and using it for commercial gain, Robinhood had a duty of care to use reasonable means to secure and safeguard its computer property, to prevent disclosure of PII, and to safeguard PII from theft.

121.   Given that Robinhood knew that a breach of its systems would damage millions of customers, including Plaintiffs and the Class Members, it had a duty to adequately protect their PII.

122.   Robinhood owed a duty of care not to subject Plaintiffs and the Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

123.   Robinhood knew or should have known that its systems did not adequately safeguard the PII of Plaintiffs and the Class Members.

124.   Robinhood knew or should have known that its systems were susceptible and/or vulnerable to cyberattacks, including those caused by social engineering such as the one that occurred here.

125.   Robinhood breached its duty of care by failing to provide, or by acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiffs and the Class Members.

31

126. Robinhood had a special relationship with Plaintiffs and the Class Members. Plaintiffs' and the Class Members' willingness to entrust Robinhood with their PII was predicated on the understanding that Robinhood would take adequate security precautions. Moreover, only Robinhood had the ability to protect its systems (and the PII that it stored on them) from attack.

127. Robinhood's own conduct also created a foreseeable risk of harm to Plaintiffs' and the Class Members' PII. Robinhood's misconduct included failing to:

    a.  Secure its customer support systems;

    b.  Secure access to its servers;

    c.  Comply with industry standard security practices;

    d.  Employ adequate network segmentation;

    e.  Implement adequate system and event monitoring;

    f.  Install updates and patches in a timely manner; and

    g.  Implement the systems, policies, and procedures necessary to prevent this type of data breach.

128. Robinhood breached the duties it owed to Plaintiffs and the Class Members in numerous ways, including:

    a.  By creating a foreseeable risk of harm through the misconduct previously described;

    b.  By failing to implement adequate security systems, protocols and practices sufficient to protect PII both before and after learning of the Data Breach; and

    c.  By failing to comply with the minimum industry data security standards during the Data Breach that would have prevented a bad actor from pretending to be a customer service employee and obtaining access to Robinhood's customer data.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

129.   But for Robinhood's wrongful and negligent breach of the duties it owed Plaintiffs and the Class Members, their PII would not have been compromised and they would have been able to prevent some or all of their damages.

130.   As a direct and proximate result of Robinhood's negligent conduct, Plaintiffs and the Class Members have suffered actual damages and are at imminent risk of further harm.

131.   The injury and harm that Plaintiffs and the Class Members suffered (as alleged above) was reasonably foreseeable.

132.   The injury and harm that Plaintiffs and the Class Members suffered (as alleged above) was the direct and proximate result of Robinhood's negligent conduct.

133.   Plaintiffs and the Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II

### NEGLIGENCE *PER SE*

### (On behalf of Plaintiffs and the Nationwide Class)

134.   Plaintiffs restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

135.   Pursuant to Section 5 of the FTCA, 15 U.S.C. § 45, Robinhood had a duty to provide fair and adequate computer systems and data security to safeguard the PII of Plaintiffs and the Class Members.

136.   The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Robinhood, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Robinhood's duty in this regard.

137.   Robinhood solicited, gathered, and stored PII of its customers to provide financial services which affect commerce.

138.   Robinhood violated the FTCA by failing to use reasonable measures to protect PII of Plaintiffs and the Class and by not complying with applicable industry standards that would have prevented a bad actor from socially engineering a customer service representative and obtaining access to Robinhood's customer database.

139.   Robinhood's violation of the FTCA constitutes negligence *per se*.

140.   Plaintiffs and the Class Members, as consumers, are within the class of persons that the FTCA was intended to protect.

141.   The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against.

142.   Robinhood's violations of the California state laws described below in Counts VII, VIII, and IX also constitute negligence *per se*. The harm that occurred as a result of the Data Breach is the type of harm such laws were intended to guard against.

143.   As a direct and proximate result of Robinhood's negligence *per se*, Plaintiffs and the Class Members have suffered, and continue to suffer, injuries and damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

144.   Robinhood breached its duties to Plaintiffs and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class Members' PII.

145.   But for Robinhood's wrongful and negligent breach of its duties owed to Plaintiffs and the Class Members, Plaintiffs and the Class Members would not have been injured.

146.   The injury and harm suffered by Plaintiffs and the Class Members was the reasonably foreseeable result of Robinhood's breach of its duties. Robinhood knew or should have known that it was failing to meet its duties, especially after experiencing an earlier breach, and that another breach could or would cause Plaintiffs and the Class Members to experience the foreseeable harms associated with the exposure of their PII.

147.   As a direct and proximate result of Robinhood's negligence *per se*, Plaintiffs and the Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

### COUNT III

### BREACH OF CONTRACT

### (On behalf of Plaintiffs and the Nationwide Class)

148.   Plaintiffs restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

149.   When Plaintiffs and the Class Members provided their PII to Robinhood to create their accounts on its website, they entered into contracts by which Robinhood agreed to protect their PII in accordance with its Privacy Policy.

150.   Robinhood solicited and invited its customers, including Plaintiffs and the Class, to provide their PII and open their trading accounts on its mobile application and website using their PII.

151.   An explicit part of the offer, and part of the price paid for using Robinhood's services, was that Robinhood would safeguard the PII using reasonable or industry-standard means.

152.   Robinhood also affirmatively represented on its website and in its Privacy Policy that it protected the PII of Plaintiffs and the Class in several ways, as described above.

153.   Plaintiffs and the Class accepted the offers and provided Robinhood with their PII when they opened their accounts with Robinhood.

154.   Robinhood entered into binding contracts with Plaintiffs that included a contractual obligation to reasonably protect Plaintiffs' and the Class Members' PII through, among other things, its Privacy Policy.

155.   In entering into such contracts, Plaintiffs and the Class Members reasonably believed and expected that Robinhood's data security practices complied with relevant laws and regulations and were consistent with industry standards.

156.   Plaintiffs and the Class Members would not have provided their PII to Robinhood had they known that Robinhood would not safeguard their PII as promised.

157.   Plaintiffs and the Class Members fully performed their obligations under the contracts with Robinhood.

158.   Robinhood breached the contracts by failing to safeguard Plaintiffs' and the Class Members' PII.

159.   The losses and damages Plaintiffs and the Class Members sustained (as described above) were the direct and proximate result of Robinhood's breaches of its contracts with them.

160.   Plaintiffs and the Class Members also are entitled to injunctive relief requiring Robinhood to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide credit monitoring and identity theft insurance to Plaintiffs and the Class Members.

## COUNT IV

### BREACH OF IMPLIED CONTRACT

### (On behalf of Plaintiffs and the Nationwide Class)

161.   Plaintiffs restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

162. When Plaintiffs and the Class Members provided their PII to Robinhood to create their accounts on its website, they entered into contracts by which Robinhood agreed to protect their PII in accordance with its Privacy Policy.

163. Robinhood solicited and invited its customers, including Plaintiffs and the Class, to provide their PII and open their trading accounts on its website using their PII.

164. An implicit part of the offer was that Robinhood would safeguard the PII using reasonable or industry-standard means.

165. Robinhood also affirmatively represented on its website, mobile application, and in its Privacy Policy that it protected the PII of Plaintiffs and the Class in several ways, as described above.

166. Based on the implicit understanding and also on Robinhood's representations, Plaintiffs and the Class Members accepted the offers and provided Robinhood with their PII.

167. Robinhood manifested its intent to enter into an implied contract that included a contractual obligation to reasonably protect Plaintiffs' and the Class Members' PII through, among other things, its Privacy Policy.

168. In entering into such implied contracts, Plaintiffs and the Class Members reasonably believed and expected that Robinhood's data security practices complied with relevant laws and regulations and were consistent with industry standards.

169. Plaintiffs and the Class Members would not have provided their PII to Robinhood had they known that Robinhood would not safeguard their PII as promised.

170. Plaintiffs and the Class Members fully performed their obligations under the implied contracts with Robinhood.

171.   Robinhood breached the implied contracts by failing to safeguard Plaintiffs' and the Class Members' PII.

172.   The losses and damages Plaintiffs and the Class Members sustained (as described above) were the direct and proximate result of Robinhood's breaches of its implied contracts with them.

173.   Plaintiffs and the Class Members also are entitled to injunctive relief requiring Robinhood to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide credit monitoring and identity theft insurance to Plaintiffs and the Class Members.

## COUNT V

### UNJUST ENRICHMENT

### (On behalf of Plaintiffs and the Nationwide Class)

174.   Plaintiffs restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

175.   This count is plead in the alternative to Counts III and IV above.

176.   Plaintiffs and the Class Members conferred a monetary benefit on Robinhood. Specifically, they purchased financial products through Robinhood and paid fees to Robinhood.

177.   Robinhood knew that Plaintiffs and the Class conferred a benefit on Robinhood. Robinhood profited from their purchases and used their PII for its own business purposes.

178.   The monies for goods and services that Plaintiffs and the Class Members paid to Robinhood were to be used by Robinhood, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

179.   Robinhood failed to secure the Plaintiffs' and the Class Members' PII, and therefore, it was unjustly enriched by the trading accounts Plaintiffs and the

38

Class Members opened with Robinhood, and that they would not have opened had they known that Robinhood did not keep their PII secure.

180.    Under the circumstances, it would be unjust for Robinhood to be permitted to retain any of the benefits that Plaintiffs and the Class Members conferred on it.

181.    Robinhood should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the Class Members proceeds that it unjustly received from them. In the alternative, Robinhood should be compelled to refund the amounts that Plaintiffs and the Class Members overpaid.

## COUNT VI

## DECLARATORY JUDGMENT

### (On behalf of Plaintiffs and the Nationwide Class)

182.    Plaintiffs restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

183.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

184.    Robinhood owes duties of care to Plaintiffs and the Class Members which required it to adequately secure PII.

185.    Robinhood still possesses PII regarding Plaintiffs and the Class Members.

186.    Plaintiffs allege that Robinhood's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

187.   Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.   Robinhood owes a legal duty to secure consumers' PII under the common law and Section 5 of the FTCA;

   b.   Robinhood's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' PII;

   c.   Robinhood continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII;

   d.   Robinhood must comply with its explicit or implicit contractual obligations and duties of care by implementing and maintaining reasonable security measures, including, but not limited to:

      i.   Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Robinhood's systems on a periodic basis, and ordering Robinhood to promptly correct any problems or issues detected by such third-party security auditors;

      ii.   Engaging third-party security auditors and internal personnel to run automated security monitoring;

      iii.   Auditing, testing, and training its security personnel regarding any new or modified procedures;

      iv.   Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Robinhood's systems;

40

  v. Conducting regular database scanning and securing checks;

  vi. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

  vii. Purchasing credit monitoring services for Plaintiffs and the Class Members for a period of ten years; and

  viii. Meaningfully educating its users about the threats they face as a result of the loss of their PII to third parties, as well as the steps Robinhood's customers must take to protect themselves.

188. This Court also should issue corresponding prospective injunctive relief requiring Robinhood to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

189. If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Robinhood. The risk of another such breach is real, immediate, and substantial, especially given the fact that Robinhood has experienced multiple breaches. If another breach at Robinhood occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

190. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Robinhood if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damages. On the other hand, the cost to Robinhood of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Robinhood has a pre-existing legal obligation to employ such measures.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

191.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Robinhood, thus eliminating the additional injuries that would result to Plaintiffs, the Class Members, and other consumers whose PII would be compromised.

## COUNT VII

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*

### (On behalf of Plaintiffs and the Nationwide Class)

192.   Plaintiffs restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

193.   Robinhood is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

194.   Robinhood violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

195.   Robinhood's unlawful, unfair acts and deceptive acts and practices include:

   a. Robinhood failed to implement and maintain reasonable security measures to protect Plaintiffs' and Class Members' PII from unauthorized disclosure, release, and theft, which was a direct and proximate cause of the Data Breach;

   b. Robinhood failed to:

      i. Secure its e-commerce website;

      ii. Secure access to its servers;

      iii. Comply with industry standard security practices;

      iv. Employ adequate network segmentation;

      v. Implement adequate system and event monitoring;

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

vi.  Utilize modern payment systems that provided more security against intrusion;

vii.  Install updates and patches in a timely manner; and

viii.  Implement the systems, policies, and procedures necessary to prevent this type of data breach.

c.  Robinhood failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and Class Members whose PII has been compromised;

d.  Robinhood's failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumer data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTCA, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5 *et seq.*, and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*;

e.  Robinhood's failure to implement and maintain reasonable security measures also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Plaintiffs and Class Members could not know of Robinhood's inadequate security, consumers could not have reasonably avoided the harms that Robinhood caused;

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

f.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs and Class Members' PII, including by implementing and maintaining reasonable security measures;

g.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTCA, 15 U.S.C § 45; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*;

h.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' PII;

i.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTCA, 15 U.S.C § 45; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*;

j.  Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82; and

k.  Among other ways to be discovered and proved at trial.

196.  Robinhood's representations and omissions to Plaintiffs and Class Members were material because they were likely to deceive reasonable consumers about the adequacy of Robinhood's data security and ability to protect the privacy of consumers' PII.

44

197.   Robinhood intended to mislead Plaintiffs and Class Members and induce them to rely on its misrepresentations and omissions.

198.   Had Robinhood disclosed to Plaintiffs and Class Members that its data systems were not secure and, thus, vulnerable to attack, Robinhood would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Robinhood received, maintained, and compiled Plaintiffs' and Class Members' PII as part of the services and goods Robinhood provided without advising them that Robinhood's data security practices were insufficient to maintain the safety and confidentiality of Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members acted reasonably in relying on Robinhood's misrepresentations and omissions, the truth of which they could not have discovered.

199.   Robinhood acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs' and Class Members' rights.

200.   As a direct and proximate result of Robinhood's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial.

201.   Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Robinhood's unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; injunctive relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; and other appropriate equitable relief.

202.   Plaintiffs and Class Members are entitled to injunctive relief requiring Robinhood to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring

procedures; and (c) continue to provide adequate credit monitoring to all Class Members for a minimum of ten years.

## COUNT VIII

## CALIFORNIA CUSTOMER RECORDS ACT ("CCRA")

## CAL. CIV. CODE § 1798.80, *ET SEQ.*

**(On behalf of Plaintiffs Glinoga and Ocampo and the California Subclass)**

203.   Plaintiffs Glinoga and Ocampo and California Subclass Members restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

204.   This Count is brought on behalf of Plaintiffs Glinoga and Ocampo and the California Subclass.

205.   "[T]o ensure that Personal Information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

206.   Robinhood is a business that maintains PII about Plaintiff Ocampo and California Subclass Members within the meaning of Cal. Civ. Code § 1798.81.5.

207.   As a direct and proximate result of Robinhood's violations of Cal. Civ. Code § 1798.81.5, Plaintiffs Glinoga and Ocampo and California Subclass Members suffered damages, as described above and as will be proven at trial.

208.   Plaintiffs Glinoga and Ocampo and California Subclass Members seek relief under Cal. Civ. Code § 1798.84, including actual damages, civil penalties, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT IX

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

## VIOLATIONS OF CALIFORNIA'S CONSUMER PRIVACY ACT

## Cal. Civ. Code § 1798.100, *et seq.*

## (On Behalf of Plaintiffs Glinoga and Ocampo and the California Subclass)

209.   Plaintiffs Glinoga and Ocampo and California Subclass Members restate and reallege all preceding allegations above and hereafter as if fully set forth herein.

210.   Through the above-detailed conduct, Robinhood violated California's Consumer Privacy Act ("CCPA") by subjecting the nonencrypted and nonredacted PII of Plaintiffs Glinoga and Ocampo and California Subclass Members to unauthorized access and exfiltration, theft, or disclosure as a result of Robinhood's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

211.   In 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on certain businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected.

212.   Defendants are subject to the CCPA and failed to implement reasonable procedures which resulted in a bad actor digitally pretending to be a customer service representative and thereby obtaining access to Robinhood's customer database.

213.   Section 1798.100(e) of the CCPA states: "A business that collects a consumer's personal information shall implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure . . . ."

214.   Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

215.   Plaintiffs Glinoga and Ocampo are both a "consumer" as defined by Cal. Civ. Code § 1798.140(g) because he is a natural person residing in the state of California.

216.   Defendants meet the definition of a "business" as defined by Civ. Code § 1798.140(c) because they are corporations that do business in the state of California and have total annual revenues of in excess of $25,000,000.

217.   Through the Data Breach, Plaintiffs' and California Subclass Members' PII was accessed without authorization, exfiltrated, and stolen by a bad actor in a nonencrypted and/or nonredacted format.

218.   The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information that would have prevented a bad actor from socially engineering a Robin Hood customer service representative.

219.   In accordance with Cal. Civ. Code § 1798.150(b), on or about November 19, 2021 and December 6, 2021, Plaintiffs' counsel served Robinhood with notice of these CCPA violations. Defendants failed to adequately respond to those notices.

220.   On behalf of California Subclass Members, Plaintiffs Glinoga and Ocampo seek injunctive relief in the form of an order enjoining Robinhood from continuing to violate the CCPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class Members described above, seek the following relief:

    a.  An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class and Subclasses as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representative of the Class and Subclasses requested herein;

    b.  Judgment in favor of Plaintiffs and the Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

    c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class Members as requested herein;

    d.  An order instructing Robinhood to purchase or provide funds for credit monitoring services for Plaintiffs and all Class Members;

    e.  An order requiring Robinhood to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

    f.  A judgment in favor of Plaintiffs and the Class Members awarding them pre-judgment and post judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law, and

    g.  An award of such other and further relief as this Court may deem just and proper.

AMENDED CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2
Plaintiffs demand a trial by jury on all triable issues.

3

4
Dated: March 29, 2023

SIRI & GLIMSTAD LLP

5

6
By: */s/ Elizabeth A. Brehm*

Elizabeth A. Brehm (*pro hac vice*)

7
Mason Barney (*pro hac vice*)

Sonal Jain (admitted *pro hac vice*)

8
745 Fifth Avenue, Suite 500

9
New York, NY 10151

Tel: (212) 532-1091

10
Fax: (646) 417-5967

11
mbarney@sirillp.com

ebrehm@sirillp.com

12
sjain@sirillp.com

13

14
SHUB LAW FIRM LLC

Jonathan Shub

15
134 Kings Hwy E., 2nd Floor

16
Haddonfield, NJ 08033

Tel: (856) 772-7200

17
jshub@shublawyers.com

18

19
HELD & HINES, LLP

Philip M. Hines (admitted *pro hac vice*)

20
2004 Ralph Avenue

Brooklyn, New York 11234

21
(718) 531-9700

22
phines@heldhines.com

23

24
*Attorneys for Plaintiffs and the Proposed Classes*

25

26

27

28
50